We have 20-9543 Pérez versus Wilkinson. I'll stop at Pérez. Go ahead. Please, Counselor. Thank you, Your Honor. May it please the Court. My name is Adam Craik. I'm here today on the behalf of Ms. Pérez de Siguenza. And Your Honor, I think that the best way to describe what we're going through these days is immigration in the last four years has kind of been like throwing darts at a And we are now faced with an issue where we firmly believe that appellate review in this matter did not take place, fundamental appellate review. And to give context, I think it's important to note that the record of proceedings wherein I represented Ms. Pérez de Siguenza at an individual hearing, which took place on May 4th, 2018. And then after that, the record closed and the proceedings went and the judge reserved his decision, did not issue an oral decision at that time, but then came out with a written decision much later or approximately a month and a half later. And on June 11th, 2018, the Attorney General at the time, Mr. Sessions, referred himself and came out with his decision of matter of AB. Important to note that was quite a month and a half after, or not a month and a half, but a month and a couple of days after the record had closed. Then on June 23rd, the immigration or June 18th, the immigration judge issued his written decision. In that written decision, Your Honors, the judge used what was guiding principle at that time and not, I would not say controlling, but guiding principle, which was the specifically overruled at that time. But in a footnote, the immigration judge made it clear that his decision was based on what was controlling precedent at that time, which was matter of ARCG, and I guess not controlling, forgive me, guiding precedent. But did make it clear that if matter of AB would have been applied, he most likely would have decided against as well under that standard. And it's important to know that because we want to make sure we understand all the more likely, you know, when he says applying AB, the court finds that the proper PSG is not cognizable under that case, isn't it? Albeit relegated to a footnote, an explicit finding. Yet, Your Honor, I apologize. He does explicitly find that. And I think the more important note here is that he does it in a footnote. And honestly, at the end of the day, which is what I want to specifically address is the fact that you've done that in a footnote, but after the record is closed and then never even giving the ability to give us the opportunity to go back and say, well, here's why, because the government, and I think the government would agree here, it's always been the government's assertion that rigorous analysis is required under BIA standards. I mean, it's said that in many, many cases, even in the matter of AB, Attorney General Sessions makes it clear that rigorous analysis must be done and rigorous analysis has to be applied. Well, what we get when we get the decision back from the BIA is general classifications, generalities. And Your Honors, we submitted a 25 page brief on the appeal showing why under matter of ARCG, our PSGs, and when I say PSGs, and I know we all understand, but let's make it abundantly clear, our particular social groups that we've delineated, why those were not recognized. But instead of getting a why it wasn't recognized, why recognition wasn't given, we were given, well, generally, when we look at these, if it relates to domestic violence or gang related conduct, generally, that's not going to qualify. So instead of going in and saying, well, when we analyze this, it's not a it's not a matter of society, which was our assertion that that the societal norms endemic to the society itself, endemic to being a woman in those in those conditions, endemic to being a woman in those conditions is tangential. But one of the PSGs that we raised originally was child abuse that never even got addressed. Child abuse never even got discussed by any of the judges, by by any of the appellate review, by the BIA. Judge Greer, in his original decision, did say it in a footnote that categorically child abuse is not is not a PSG, but we don't know why. We don't know why it was endemic to or why it was not endemic to the society, why it was not a condition of being a child in those societies. We just get that it's circular in reasoning that the persecution defines the harm. And we don't understand why, Mr. I want to I just want to contextualize the argument you're making now with respect to your brief. Are you talking now about the contention that the BIA improperly applied a B matter of a B? Is that what we're doing now? Is that what you're talking about? No, that's and I think that that's important to know what I think is. Where we're looking at what we're saying is, is even even if they did apply a matter of a B, they didn't even give us rigorous analysis, they just generally applied it in a way that did not give us context as to why the PSGs even applied. OK, well, what I want to focus on for a moment, please, is the alternative holding related to nexus, the the IJ made a holding that there was not a nexus between the proffered PSGs and the persecution, both as it relates to Ms. Perez and the the derivative beneficiaries, if you will, associated with that application that there wasn't a nexus. The BIA, when it ruled it all, it spoke about cognizability, but it also spoke about this alternative holding of nexus. And what what occurs to me and I want your response to this is that irrespective of your retroactivity argument, irrespective of whether the analysis as it relates to cognizability was particularized or rigorous, if if we find that that nexus holding is sound and supported by substantial evidence and that and that nexus holding gives you your PSGs, it accepts the premise that those are viable PSGs. Isn't that the end of the story for you? Well, and I think that's where we argue that the nexus did qualify with the and I that argument is valid, but I'm just trying to understand analytically if if in fact we were to conclude that the the BIA's nexus holding was sufficient, was supported by substantial evidence, that does away with the need to analyze any of these other issues. Isn't that correct? I think that that probably would be correct. But I think that in in the circumstances that we have here, I don't think that they actually gave us a nexus argument that was sufficient enough to actually look at what the PSGs that were presented in conjunction to our arguments and why our nexuses did qualify. And I think that they just glossed over that as well. I don't think that they gave us any sort of contextual legal principles that we could use to cognizably identify that they did sufficiently eliminate the nexus. And I think that that's where we're also I think that there's a problem there because I again, the BIA says no nexus, but they don't tell us specifically why. And they don't go into any sort of rigorous analysis on why our nexus was incorrect. And I think that that's the issue that we are looking at. I think that. Can I ask you maybe to just flesh this out for me in one specific context? There's two possible avenues for challenge. The BIA didn't adequately explain its determination or or and or that there is not sufficient evidence to support the BIA's finding that there was a lack of nexus between the persecution and the three PSG and the PSG for the three petitioners. So what I understand you saying is it's the former that you're arguing, you're challenging, that there was an inadequate explanation. You're not questioning the sufficiency of evidence to support the BIA's determination that there was a lack of nexus. Am I correct? You're correct, your honor. Yes, you are correct. And what would be your authority to support the notion that this this explanation was not sufficient? I mean, if they if they accept your PSGs and you had, for example, Salvadoran women unable to leave a family relationship, at least the IJ and I believe the BIA concluded that that she left the family relationship. Ms. Perez did. And so that she wasn't even a member of the PSG she claimed. And so but what what is what's your authority that to suggest that this was not a sufficient explanation? Just because somebody ultimately gets away and escapes. They voted with their feet, they've moved with their feet to get away, to desperately try to attempt to get away, there was no protection there, there was nothing that group was not immutable. I mean, if you know, I it's my understanding that's a condition of a PSG. Am I wrong on that? Well, and I think that that's where the years and years of experts that have come up with the idea that the immutability and I think that that's a valid question. The problem that we have is instead of looking at the hundreds of pages that we submitted by experts, anthropologists, psychologists, sociologists that say, look, you're trying to say that this is a harm that's defined by the persecution. But really, in this context, it's a societal norm. It's something that occurs in society. And that the fact that she did ultimately escape doesn't eliminate the fact that she was stuck in a situation where she theoretically and by societal norm and culture couldn't get away from. Now, did she ultimately escape? Sure. But she had to literally flee from that situation. That doesn't mean it eliminates the fact that she suffered severe amounts of harm. It doesn't it doesn't take that away. And somebody shouldn't have to flee a situation like that because there's no protection available to them. Well, I don't question for a moment that El Salvador is a chaotic, troubling place to be where people have to flee a lot of things. But but the question for us is whether there is an immutable particular social group that she can claim to be a part of, which I take it. You accept the premise that that has to be independent of the persecution itself. You're right. I absolutely have to do that. And I think that's I think that's the evolution of our case law, which in all candor right now, it's almost impossible to create a PSG to be perfectly candid with your honor. It's virtually almost impossible to come up with that in context other than perhaps the LGBT group, LGBTQ, that that might that is kind of reaching those standards now. But to identify a PSG based on gender alone as it currently sits, we're in a situation where it's virtually almost impossible to give you something that meets every definitional section now that's been established by AB. I mean, we're in a we're in a we're in such a politicized environment. And forgive me, it's it's politics that have put us in this position to where we're almost precluded from giving you something that a gender based PSG will qualify. Well, if that is the position of the agency now and that's where we are and and and and sort of embedded in what I understood you to say is the progression that was caused in part by AB to put us where we are is that there is at least the contention that's been made. And I'd like your response to it. The contention that was made that this notion of the independence of the PSG from persecution precedes AB. Matter of AB basically was righting the ship in terms of saying, look, the decision. What is it? Matter of ARCG was essentially going rogue in terms of its evaluation of this independence nexus and that the attorney general corrected that. So is it your view that a matter of AB birthed the independence nexus? I mean, the independence of the in defining a PSG, the need to have independence from persecution. Was that a preceding concept or construct before a matter of AB? Your Honor, it previously existed. Absolutely. And the court knows that and the precedent says that. But I think where it where it evolved, too, is they started paying attention all the way from back in 1996 with Janet Reno all the way back. And it started evolving from there. And ultimately, the department recognized and we all know that there was a stipulation in place. And that's what the attorney general is trying to say, that he fixed that he overruled. But if that was the case, then why did the BIA just simply say in the in our opinion that they issued generally you don't qualify instead of actually saying, OK, we know that we have this previous decision that was issued under ARCG. We know that we have the new decision under AB. Here's why under both under both cases in the context we're looking at in rigorous analysis, the PSGs don't qualify instead of just giving us a generality that they just don't qualify without even going into any sort of reason why and defining why it was circular in nature other than one sentence that says, according to a matter of AB, this is circular in nature. I mean, it didn't give us any sort of legal cognizable argument to make to your honors as to why actually our PSGs did work. It didn't give us that ability. And then L.A. came out a year later. We didn't even get to argue about L.A. because we didn't even know it existed. Before before you end, I want to get I want to make sure I get your position on the retroactivity issue. Deniz, your honor, Deniz, I'm sorry. Your case in Deniz is our position. OK. All right. OK, I'll I'll leave it alone and reference that later. OK, your time is up and we'll see how it goes. Thank you. In terms of rebuttal time. Thank you. Counsel for the government, please. May it please the court, this is Sarah Bird on behalf of the government. There are three petitioners here and each one has a particular social group that they proposed. So we have multiple layers of the decision here. So I want to start out by just outlining that. Ms. Perez, the lead petitioner, proposed the social group Salvadorian Children and Women Unable to Leave a Relationship. And the agency denied her claim based on that social group on two bases. One, finding that the social group was not cognizable because it's circularly defined by the harm. And two, finding that even if it was cognizable, she didn't demonstrate the requisite nexus between the harm being motivated by her membership in that group. Then the daughter, Miss Jenny, had the particular social group of young Salvadorian women unable to leave imposed putative relationships with gang members. And again, the agency said that the social group was not cognizable. And alternatively, there was she hadn't shown the requisite nexus. And then she left, right? Well, that the left went to Ms. Perez, the mother. Well, she was never in the putative relationship. Right. Jenny was never in the relationship to begin with. Ms. Perez left. And the son, was it just his family base? Was just family. Right. So those are the three we have. And the son nexus is the only basis. The board did also make a social distinction finding, but we're not relying on that because it goes beyond the factual findings made by the IJ. So with regard to the son, it's just nexus. With regard to the other two, it's both cognizability and nexus. With regard. Oh, no, please go ahead. With regard to Jenny, I want to ask you about your argument of circularity with Jenny. Now, to the extent that the persecution is predicated on Nelson's persecuting her, I think you have a good argument that it is circular. But that is not the extent, as I understand her argument. They took that they occupied her house. Nelson, for example, was not present when they occupied the house. The gang members who wanted to kidnap Jenny at that point were, according to Petitioner, were going to kidnap her, you know, and do other bad things to her because she was claimed by Nelson as his girlfriend. So it seems to me that circularity may apply to the mother. But to the extent that Jenny is claiming persecution from Nelson, the circularity is not an impediment, as I understand it, to persecution by the other gang members who were enforcing Nelson's putting Jenny in as a captive girlfriend. What's your response? OK, I see the distinction you're making. So just to reflect back what you said, you're saying that the initial part of him saying you're my girlfriend and I'm going to force you to be in this relationship you don't want, that's circular. But then if other people then persecute her later on that basis, it's less circular. So I do see the distinction. And I think that theoretically there could be a distinction in some cases. I think here the record does not compel the conclusion that those gang members reiterating, oh, you're Nelson's, you're the person he has identified as his girlfriend was anything more than a continuation of the same harm that she was saying put her in this imposed putative group, that it's imposed and putative, not just by Nelson, but by all the gang members are suddenly saying you belong to him. So that was what created the, quote, inability to leave. And I think that reflects on why A.B. found unable to leave such a problematic phrase. It's not intended to be this general categorical. You can never use those words. But what you do have to prove, what a petitioner has is this burden to show my inability to leave is as a result of something other than the harm that is going on here. And his facts are a prototype of what you just said, that the persecution, that the PSG has to be in existence prior to the determination of whether there's a causal relationship to the persecution. And it just so happens that if the other gang members are tormenting Jenny because she has been claimed, then that PSG will proceed the persecution. The persecution is on account of her being in this putative relationship with Nelson. Well, right. I think it does precede it. So chronologically short, I think that the record here, maybe the judge could have inferred that, but the record doesn't compel the conclusion that that was the motive as opposed to just a continuation of the same harm that she said was trapping her into the relationship. So the gang members actually appear to have targeted the house not to seek after Jenny and not to seek after Mr. Alexis, but instead because it was a store and they were targeting it because they wanted the goods, they wanted the money. They were based on her testimony. So I think we have a situation where we don't know exactly what their motives are and the record doesn't compel the conclusion. I'm not saying that you couldn't make that inference, but the record doesn't compel the conclusion would be our argument there with regard to the nexus for Jenny in answer to your question. Thank you. Let me let me focus for a second on your footnote three of your your brief, because that really it puzzled me what you're getting at in terms of the notion that you're not defending the position of the BIA on cognizability. I take it what you're saying is that by virtue of its taking a de novo review of cognizability, that that it was doing something improper because the IJ, the IJ, they exceeded their scope of review essentially in doing that. Well, I mean, as it relates to LEA and relates to LEA and LEA's view of cognizability. What what I don't understand is where does it get us in terms of their LEA argument? I mean, because their argument was in their initial brief, they joined LEA in matter of AB and said there's a retroactivity problem because the BIA applied LEA and AB. And in your footnote three, you say, well, we're not defending the BIA's analysis as it relates to LEA. So are you saying that are are you saying that there's a retroactivity problem where we don't have jurisdiction? Are you saying that the LEA argument is now irrelevant because because you're not defending it and you're relying upon the nexus determination of the BIA? What what what does that get us? We're you're. Yes, your honor. So it's more the latter. What you said at the end that it really it wasn't about LEA and it wasn't about retroactivity. It was about the three criteria, social distinction, immutability and particularity. And social distinction is the one that the board relied on. The board said his family is not socially distinct. But then when I look back at the immigration judge's decision, the immigration judge didn't make a factual finding as to the social distinction. And that's why I didn't defend that, because we would argue and I think it's clear under the case law that social distinction is a factual finding that has to be based on the record. And because the board seems to have missed the fact that they they acted as if they were affirming a factual finding as to social distinction. But there wasn't one. Oh, I get that, I get that. And you cited, I think, HCFR one thousand three point one D on three on that point. And I took it that that was at least an oblique way of telling me that that that they see they they exceeded their scope of review. The BIA did. But but what I'm trying to understand is what's the import of that? I mean, because their argument, their their argument was that was that the BIA applied retroactively, not only just AAB, but matter of LEA. And and you're saying I'm not defending LEA and what the BIA did on that. But what what do we do with this this argument out there? I'm just trying to figure out, do we say that that argument is also one for which was not exhausted because because the because it was not raised by the BIA? What? Sure. We would say that both AAB and LEA were not exhausted. Neither was raised to the board. But we're not relying on the board's application of LEA because that goes to the cognizability of Alexis's group. And we are relying for purposes of him solely on the nexus determination. So if if this court were where that leaves the court, is that if this court were to decide that you disagree with the nexus, not only disagree, but that the record compels the conclusion that the board got the nexus wrong, that would be it for Alexis, because we're not relying on the cognizability because we think the board went beyond what the immigration judge had done in factual findings. So that would be it for Alexis in the sense that it would go back. But but but in this situation, if we do, I understand it correctly, then that irrespective of the exhaustion issue, your point is simply that for since you rely on the nexus determination, they to defend the judgment, you should win on that ground. And so simply this argument about LEA is one that you deem, at least for your purposes, to be irrelevant. And you're focusing on nexus. And so even if we were to find that they had exhausted it, even though they didn't arguing the BIA, even if we were to find that that there was not a problem now with them making that argument, you say so what you still win on the nexus ground. Do I understand that correctly? That's correct. That's correct. We're for purposes of Alexis's claim, we're relying solely on the nexus. OK, there is the exhaustion issue. And I'm glad you brought that up, because in the footnote that the immigration judge mentioned, A.B. and I understand the frustration of A.B. coming out after the merits hearing. But A.B. was a part of the immigration judge's decision. And so petitioners did have the opportunity to challenge the application of A.B. before the board, but didn't. And so it wasn't exhausted before the board. For example, there's no explanation in their brief as to why they are unable to leave particular social groups or somehow distinguished from A.B. or that A.B. shouldn't apply to them. Instead, they do define their inability to leave by the harm. They focus in on the harm. And there's a lot of focus on the severity of the harm, particularly with regard to the child abuse. And the government doesn't dispute that that is severe and awful harm. The question is whether it was on account of a protected ground versus being circular. And child abuse is itself defining by the harm. It's circular. And as the immigration judge found, Ms. She got married. Then she left her ex-husband and she lived. It wasn't just as petitioners counsel said that she fled to the U.S. She lived and co-parented in El Salvador with it seems fairly peaceably or amicably. Her ex-husband wasn't pursuing her, forcing her back. Her family wasn't pursuing her, forcing her back. She was able to leave. So she wasn't even a member of the group. Yeah. And I'm so sorry to interrupt you. And I didn't mean to cut you off before you completed your thought. I did want to ask you one, if you don't mind, two quick questions. One is now you rely on the footnote to say that the petitioner did not exhaust his argument of the retroactivity of AB. Is it fair for me to assume that you're not making that non-exhausted argument for LEA because the immigration judge never referred to LEA, although the immigration judge did refer to AB? Am I right about that? You're not questioning. No, I would say the reason I'm not making that argument is because we're not relying on the LEA finding. OK, that's fair. So let me back up and ask you if I could rewind the tape for about three and a half minutes. And you were talking when you were discussing LEA, you were saying that, well, with regard to the nuclear family for Alexis, LEA, that there is no nexus. What surprised me about it that you were catching it in terms of Alexis. Obviously, that is the only PSP that Alexis is relying on. But the mother, Mrs. Perez and Jenny, both are also relying on the nuclear family as one of their PSPs. Those they did not continue to rely on. They did at the immigration judge level. But then that was not a part of their argument in the petition for review. So they're left with only they're unable to leave. Groups. OK, thanks. Yeah, I think this is footnote footnote three and the board's decision says that they declined to address the family based groups because they weren't raised on appeal. I thought that they were making this argument to us that that that that that well, they didn't raise it to the board on appeal to the board. I mean, those have been waived along the way. So they each by now, each petitioner only has one particular social group. And for Alexis, it's the family one. And for the two women, it's the unable to leave one. But they didn't exhaust their family one before the board and the board found it and that hasn't continued to be pursued. And we're going to have an opportunity to put Mr. Crick on the on the on the hot seat to address that in one second. But I'm going to give him a few moments. But but I need to ask this question before we conclude, Miss Bird, what what is your take on the argument that the BIA's articulation of the nexus requirement? And that's what I understood now to be what we're talking about, the explanation was insufficient to support to support their their finding as it relates to the the PSG's. In other words, as I understood Mr. Crick to say, he's not talking about substantial evidence. He's saying they didn't give an adequate explanation. What's your argument to that? Well, I respectfully disagree. I think that they did give an adequate explanation. The board, if you look at the paragraph on page four of their decision, they go through and they discern they're reviewing motive. It's a factual finding for clear error. And they go through and they find no clear error in the immigration judge's determinations as to motive for each of these particular social groups. And that's enough here. I don't think that the board the board doesn't have to go into exactly what the motive is. They do mention that the gangs appear to be motivated by a desire to commit crimes, extort money and keep control over territory consistent with generalized threats of criminal violence and intimidation. What I'm getting at is, is there is there authority? Are you familiar with such an argument being made that splices out the the articulation from substantial evidence? And if so, is there some authority that would say, no, you're wrong? The V.I.A. we've, you know, circuit courts have held that's an adequate explanation. I mean, do you have something like that? I mean, as a general matter, the level of explanation here was adequate. As a general matter, we often quote the phrase the board doesn't have to write an exegesis on every claim. And I can't I can't tell you off the top of my head where that originally came from. Well, exegesis is a word I can remember. I can easily find that if I need to. Thank you. I appreciate it. Counsel, I'll take your argument and submit it. Mr. Crick, you have one minute. And if you want it, I mean, I think you would want it. But if you don't want it, you don't need it. No, I'll take it, Your Honor. OK, well, then let's start out talking about what are the keys that are on the table here? Do we have, in fact, only three, the two unable as it relates to Jenny and relates to Miss Perez and the family as it relates to the son? Correct. OK, that's correct. And to be fair, that is a valid point. And I think that we have to stick with what we got. And I think the BIA correctly issued that. And I think that that's appropriate. OK, but but I think that where the BIA has has adequately under and I get that it doesn't need to be an exegesis, which is a fantastic word. And we'll all remember that from today. But at the end of the day, we're going to be stuck with not even a more than two sentence short shrift of why those PSGs don't qualify. And I think that at the end of the day, also the use of LEA specifically in their decision, specifically to identify the family problem, was so after the fact and so, so out of the blue that there was literally no no ability to address that. And then that should have been addressed. That's something that we should have been able to address with that. Your honor, my time is up. Thank you, counsel. Thank you, your honors. Appreciate the arguments cases submitted.